IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

NICOLE TRAPHAN,

                          Plaintiff,

          v.                                              OPINION AND ORDER

WISCONSIN DEPARTMENT OF                                     22-cv-742-wmc
HEALTH SERVICES and
CHARLES ADAMS,

                          Defendants.

_____

    Plaintiff Nicole Traphan filed this civil action under 42 U.S.C. § 1983 and Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), against her former employer, the

Wisconsin Department of Health Services ("DHS"), and a former co-worker, Charles

Adams, in his individual capacity.  (Dkt. #13.)  Traphan alleges that she endured unlawful

discrimination and a hostile work environment based on her gender and race while

employed as a senior nuclear safety specialist at DHS.  Traphan further alleges that she

was retaliated against and constructively discharged after complaining about this

discrimination, ultimately causing her to resign.  Defendants have filed a motion for

summary judgment, arguing that all of Traphan's claims lack merit.  (Dkt. #25.)  After

considering all of the pleadings and exhibits in the light most favorable to Traphan,

defendants' motion for summary judgment will be granted for reasons explained below.

UNDISPUTED FACTS[1]

**A. The Parties and Their Roles**

Plaintiff Nicole Traphan, an African American female, was employed by defendant DHS in the Radiation Protection Section.  Before being hired by DHS, Traphan was employed by the Texas Commission on Environmental Quality and Texas Department of State Health Services, where her job duties involved the licensing of uranium mines, collaborating with the U.S. Department of Energy on remediation projects, environmental sampling of areas surrounding nuclear power plants, and instrument calibration.  In that role, Traphan had experience collaborating with multiple federal agencies and planning more than a dozen radiological emergency response exercises.

The Wisconsin DHS Radiation Protection Section, where Traphan worked from May 10, 2021, through May 9, 2022, is part of DHS's Bureau of Environmental and Occupational Health.  Within the DHS Radiation Protection Section there are three units: the X-Ray Unit, the Radiation Emergency Unit, and the Radioactive Materials Unit. (LeClear Dep. Ex. 1 (dkt. #28-1) at 6.)

Traphan worked in the Radiation Emergency Unit as part of a team with four other employees -- defendant Charles Adams, and non-defendants Kyle Walton, Robert Busch, and David LeClear -- all of whom were white males.  Both Traphan and Adams were

---

[1] Unless otherwise indicated, the following undisputed facts set forth in this section are taken from proposed findings of fact submitted in compliance with the court's procedures on summary judgment as provided to the parties with the pretrial conference order.  Specifically, the court resolves all material disputes and draws all reasonable inferences in favor of plaintiff Traphan, as the non-movant.  *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

employed as senior nuclear safety specialists, and were supervised by LeClear. Paul Schmidt was the Radiation Protection Section Chief until he retired in January 2022, and was replaced by Mark Paulson, who was formerly supervisor of the Radioactive Materials Unit.

The Radiation Protection Unit's responsibilities include: (1) environmental monitoring, licensing, and inspection of radiological materials; (2) oversight and safety of X-rays performed around the state; and (3) general radiological emergency preparedness. To ensure that it is adequately prepared for emergency situations, the Radiation Protection Unit also performs drills and exercises. As a senior nuclear safety specialist, Traphan's primary responsibility was to help plan and lead these drills and exercises to demonstrate the Unit's readiness to respond to radiological emergencies in Wisconsin as evaluated by the Federal Emergency Management Administration ("FEMA") and other agencies.

In particular, the Radiation Protection Unit conducts drills and exercises every other year at two operational nuclear power plants, which are regulated and licensed by the U.S. Nuclear Regulatory Commission ("NRC"): (1) the Point Beach Nuclear Power Plant in Eastern Wisconsin; and (2) the Prairie Island Nuclear Power Plant just across the state line in Minnesota. During these drills and exercises, "participants" or "players" respond to role-playing scenarios involving various emergency conditions, while one or more "controllers" provide input and ensure that the exercise goes according to plan. Although FEMA does not oversee the drills themselves, it provides oversight during certain exercises to ensure that DHS demonstrates "reasonable assurance" of its ability to respond in the event of a nuclear plant emergency. Ultimately, if DHS does not successfully complete an exercise,

3

FEMA may inform the NRC that there is no reasonable assurance that Wisconsin and the plant can respond to a nuclear emergency and protect public health. Failing an exercise may also have several consequences, the most serious of which can be the NRC shutting down the nuclear power plant.

### B. Traphan's Employment with DHS

In addition to being responsible for planning radiological emergency preparedness drills and exercises, Traphan acted as a liaison to Pierce County, the Prairie Island Nuclear Power Plant, and Wisconsin Emergency Management. Accordingly, after LeClear hired Traphan in May 2021, he told Adams to train Traphan on how to be a "Lead Controller" for drills and exercises. Adams himself started working as a nuclear engineer for DHS in 2014, after graduating from the top quarter of his class at the Naval Nuclear Program and serving as a nuclear engineer in the Navy for nine years. As part of her training, LeClear specifically instructed Traphan to shadow Adams, who was serving as the Lead Controller for an exercise at the Point Beach Nuclear Power Plant in 2021, as preparation for Traphan serving in that same role for a similar exercise planned at the Prairie Island Nuclear Power Plant in 2022.

Since Adams chose to work in the office, unlike others in the Unit who occasionally worked remotely, he and Traphan, as a probationary employee who did not have the option to work remotely, worked together on a daily basis. Initially, Adams was "very optimistic" about Traphan's hire. Indeed, he was excited to learn *from* Traphan and had no concerns about her qualifications or experience. In fact, Adams thought she may have been "overqualified." Adams further observed that Traphan had a "great deal of professionalism

4

and a willingness to take on responsibility."   Compared to previous new hires, Adams also felt that Traphan was placed on an accelerated course of learning and responsibility.

Unfortunately, the professional relationship between Adams and Traphan deteriorated soon after the start of her employment.  According to Traphan, Adams provided her with "completely inaccurate information" on multiple occasions during May and June 2021, which she initially considered to be "hazing."  (Traphan Decl. (dkt. #38) ¶ 20.)  Further, when she relied on the information Adams had provided, other employees would give her "strange looks" and ask where she had received it, which she found "very embarrassing."  (*Id*. at ¶ 21.)

Throughout June of 2021, Traphan also contends that Adams refused to allow her to shadow him in connection with his work on building and planning the Point Beach exercise.  (*Id*. at ¶ 23.)  Similarly, Traphan claims that Adams excluded her from meetings, refused to provide her with data, and limited her involvement in the planning of the Point Beach drill and exercise by assigning her secretarial duties, such as creating and printing controller packets and updating field team binders.  (*Id*. at ¶¶ 26, 31.)  When Traphan complained about being left out of the Point Beach exercise, LeClair reportedly minimized her concerns and assured her that he would be "right by her side" while she prepared the Prairie Island exercise the following year.  (*Id*. at ¶ 33.)  Adams also denies preventing Traphan from shadowing him or participating in the Point Beach exercise, while explaining that he could not involve her in creating the scenario and data for the field teams exercise because Traphan was serving as a field participant for the exercise.  (Adams Decl. (dkt. #45) at ¶¶ 13-14.)

Traphan next contends that Adams publicly shamed her during a field team training event that occurred on July 14, 2021. (Traphan Decl. (dkt. #38) ¶¶ 54-57.) In particular, she alleges that Adams became "irate" and started "screaming" at her over a minor problem, finding fault and making "exaggerated gestures" in a derogatory way with at least a dozen other people present. (*Id.* at ¶ 54.) Traphan describes the incident as "one of the most humiliating and upsetting interactions of [her] professional career." (*Id.* at ¶ 56.) In fact, Traphan was so upset and embarrassed by the incident that she chose not to attend a social event planned for that evening. (*Id.* at ¶ 57.)

Traphan describes another embarrassing incident that occurred just two weeks later. During a Wisconsin Emergency Management training event at the State Emergency Operations Center on July 28, 2021, which was presented by a FEMA investigator, Traphan gave an answer during the presentation using the term "interdiction." (*Id.* at ¶ 62.) According to Traphan, Adams immediately yelled "Not in Wisconsin" in a "mocking tone" in front of the group, which included 30 to 40 other people. (*Id.*) The presenter explained that he liked Traphan's answer, but that Wisconsin preferred the terms "hold" or "embargo." (*Id.*)

Throughout the first few months of her employment with DHS, Traphan alleges that Adams generally refused to collaborate with her or provide adequate feedback on her work. (*Id.* at ¶ 81.) As a result, by September 2021, Traphan began to believe that Adams was trying to get her to quit or be fired. (*Id.*) She specifically points to an incident that occurred that same month, when Adams assigned Traphan to be a "co-controller," along with another employee, Kyle Walton, for an exercise in Manitowoc County at Holy Family

Hospital, during which Adams planned to be absent. (*Id*. at ¶ 76.) Traphan later learned that Adams did not attend the exercise because of a historical issue between the Hospital and him. (*Id*. at ¶ 77.) Despite this, according to Traphan, Adams failed to provide her with material information about whether the Hospital had calibrated equipment for the exercise. (*Id*.) As a result, FEMA deemed the exercise a failure, which Traphan found humiliating, even though a DHS debriefing determined that Hospital staff were at fault and that no one in the Radiation Protection Unit was to blame. (*Id*. at ¶ 80.)

Traphan continued to complain to LeClear about Adams' behavior several times in July, August, and September 2021. (*Id*. at ¶ 82.) At a meeting with LeClear in October 2021, Traphan again reported that Adams was refusing to train her properly and treated her unfairly, as if she were a "secretary." (*Id*.) Traphan also repeated her previous complaints about Adams' adversarial, demeaning behavior. (*Id*.) During this same meeting, Traphan asked if she could assist Adams with the annual letter of certification to FEMA, which LeClear reportedly supported. (*Id*. at ¶ 83.) Despite Traphan's efforts to be involved, however, Adams completed the annual letter of certification by himself. (*Id*. at ¶ 84.)

In early August 2021, and again during a meeting with LeClear in October 2021, Traphan expressed an interest in being designated as a state radiological coordinator ("SRC") and joining the agency SRC team. During drills and exercises, an SRC serves as the lead coordinator for DHS, receiving and supplying necessary emergency information from Wisconsin Emergency Management, operations centers, and counties. There is no job title or position at DHS solely designated as an SRC. Rather, it is a role that is assigned

to employees in addition to their official job title and work duties after completing training and testing. Moreover, an employee must first get approval from their supervisor to participate in training. Supervisor approval for participation in training and testing for the SRC designation depends on the employee's capacity to complete the training and testing in addition to their regular job duties. If an SRC serves as an "on-call SRC" for a given month, there is a pay differential of $250 to $300 that month.

The Radiation Protection Section Chief had the ultimate say in who became an SRC, but all SRC team members generally voted and looked for a consensus vote in nominating and appointing an employee to an SRC role. As of approximately August 2021, the SRC team members included Adams, LeClear, Mark Paulson, and Paul Schmidt, who announced his upcoming retirement in the early fall of 2021. (Paulson Decl. (dkt #44) ¶ 5).) Because Schmidt's imminent retirement would leave DHS with an open SRC position, the other members of the SRC team sought to designate someone new as quickly as possible. (*Id*. at ¶ 7.)

In August 2021, both Traphan and another DHS employee, Luther Loehrke, a white male who had been employed by DHS in the Radioactive Materials Program Unit since 2015, took part in a formal SRC training activity that entailed running nuclear power plant emergency scenarios in the role of an SRC. After observing their performance, Paulson, who was the supervisor of the Radioactive Materials Program Unit at that time, and the other SRC team members decided by consensus that Loehrke would be the best choice to designate as an on-call SRC as quickly as possible. In Paulson's opinion, it would have been inappropriate to place Traphan, or anyone else who had only been with DHS for four

8

months, in an on-call SRC position that required making high pressure and time-sensitive decisions.  (Paulson Decl. (dkt. #44) ¶ 12.)

Loehrke was then given an SRC qualification journal in August or September 2021, and an updated version of that journal in January 2022.  (*Id*. at ¶¶ 13, 15.)  The SRC qualification journal lists courses and on-the-job training that must be completed or waived on a case-by-case basis by the lead SRC.  (LeClear Dep. Ex. 6 (dkt. #28-6) at 3-5.)  The journal also includes space for a candidate to document drills, exercises, and incident investigations completed.  (*Id*. at 6-7.)

At some point during the fall of 2021, Adams tasked Traphan with drafting recommendations and proposed revisions to the Emergency Response Plan to bring it up to date with the 2019 revised FEMA Radiation Preparedness Manual ("RPM"), which had reorganized exercise criteria and included more detailed demonstration requirements. (Traphan Decl. (dkt. #38) ¶ 86.)  Although Traphan proceeded to offer over 20 recommendations, Adams dismissed every one of them without explanation or feedback. (*Id*. at ¶ 87.)

During a subsequent one-on-one meeting with LeClear in late 2021, Traphan once again expressed dissatisfaction with the training she received from Adams and stated that she thought Adams was setting her up to fail.  LeClear had received complaints from many other DHS employees about Adams, including Robert Busch, Kyle Walton, Mark Paulson, and Megan Shober.  Busch reported getting into heated arguments with Adams, which despite Busch trying to disengage, Adams would continue.  Walton also told LeClear that the reason he did not speak up at meetings was because he was afraid Adams would "rip[]

9

into him" about what he had to say.  Finally, Shober told LeClear that she did not want to participate in any exercises with Adams because of his behavior, which was especially poor during stressful situations.

LeClear had also personally observed Adams frequently being defensive and speaking over people, even Paulson, who would become Unit chief.  LeClear also noticed that Adams construed disagreements, or even simple questioning for understanding, as being argumentative.  Indeed, it was apparent to everyone in the Radiation Protection Unit that Adams' communication style was "overly combative."  Adams himself acknowledges that his communications can come out "very flat and harsh," although he believes he has improved due, in part, to training programs recommended by his previous supervisor.

In early 2022, while Adams and Traphan discussed a roster that Traphan was preparing for her upcoming Prairie Island drill, Adams became frustrated.  In particular, Traphan avers that while she was presenting the drill roster, Adams stood up, leaned across the conference room table, and started screaming at her about how she could not have certain individuals at her drill, after which he "stormed" back to his cubicle, which was near Traphan's, and "aggressively" began clicking his pen.  (Traphan Decl. (dkt. #38) ¶¶ 94, 96.)  Traphan found the interaction so disturbing that she took a few hours of personal leave before emailing LeClear, reiterating her concerns about Adams' treatment, and advising that Adams' ongoing conduct was forcing Traphan to reconsider her future with DHS.  (*Id*. at ¶ 97.)

In February 2022, Traphan alleges that Adams again screamed at her about the Prairie Island drill roster as she sat at her cubicle.  (*Id*. at ¶ 98.)  While Adams claimed that

10

another employee had come to him with questions about the roster, Traphan later learned that Adams was the one who had solicited questions about the roster from staff.  (*Id*.)  In response to this outburst, LeClear told Adams not to discuss the roster with other employees unless they went to Traphan or LeClear first.  (*Id*. at ¶ 100.)

On March 15, 2022, Traphan conducted her first drill as lead controller, with Adams as the assigned SRC.  Traphan alleges that Adams arrived 45 minutes late, disrupting the drill and causing a delayed response to the nuclear power plant's notice of emergency, which she found embarrassing.  (*Id*. at ¶ 105.)  Adams disputes this, claiming that he arrived only 10 minutes late.  That same day, LeClear sent Traphan an email inviting her to become part of the SRC team and provided her with the SRC qualification journal to review, although LeClear also told Traphan that her completion of the items in the journal did not *guarantee* being put on the SRC team.

Several days later, on March 18, 2022, LeClear had a one-on-one meeting with Traphan to discuss her performance and progress in her position at DHS.  During that meeting, Traphan once more raised concerns about her working relationship with Adams, questioning *for the first time* whether Adams was discriminating against her because of her race or gender.  In response, LeClear shared with Traphan some of his own difficulties with Adams.  Although LeClear had disagreements with Adams throughout his time at DHS, LeClear considered Adams the most experienced and knowledgeable employee in the unit when it came to DHS's drills and exercises.

Shortly after Traphan complained to LeClear about Adams on March 18, 2022, Adams had his annual performance review.  On March 31, 2022, LeClear prepared a

11

Performance Expectations and Planning ("PEP") document that identified the following expectations:

> During this PEP period I would like Charles [Adams] to put considerable effort into improving his oral communication skills, including:
>
> - Taking time to actively listen to others first before speaking up.
> - Speaking in a tone that is taken as helpful and not condescending.
> - Not indicating blame and accusations during conversations including when they are in groups of people.

(LeClear Dep. Ex. 7 (dkt. #28-7) at 3.)  Adams was also expected to:

> - Seek and participate in training on health equity, racial injustice, and other current social issues.
> - Expand personal knowledge of health equity, racial disparities, social determinants of health, implicit bias, and other socially important concepts by enrolling in available training session/courses.
> - Explore opportunities to obtain health equity, racial inequality, or other trainings or seminars on socially relevant issues to build personal and professional knowledge.

(*Id*. at 7.)  Although LeClear commented in the PEP document that Adams met his expectations for communicating and cooperating with others, he added that Adams needed to "work on improving his relationships with his peers and outside organizations."  (*Id*. at 12.)

### C.  Traphan's Resignation

After Traphan complained to LeClear about discriminatory treatment on March 18, 2022, she learned that Adams had expressed concerns of his own about her lack of experience and poor performance at the Holy Family exercise to Todd Trygier, who was the FEMA Site Specialist for Wisconsin.  (Traphan Decl. (dkt. #38) ¶ 117.)  While they were attending the National Radiological Emergency Preparedness Conference in Nashville

12

in early April 2022, Trygier allegedly told Traphan that he would be insisting that his supervisor and he have a "Staff Assistance Visit" with her about the Prairie Island Nuclear Power Plant exercise.  (*Id*. at ¶ 118.)  Traphan understood this to mean that her Emergency Response Plan would be under heightened scrutiny, causing her concern because Adams had refused to accept changes Traphan had suggested based on new requirements in the 2019 FEMA Radiological Preparedness Manual.  (*Id*. at ¶ 119.)

Traphan asserts further that on April 22, 2022, while she was preparing for the May 2022 Prairie Island exercise and field team training event, Loehrke approached Adams with a question about the training assignments.  (*Id*. at ¶ 122.)  However, instead of telling Loehrke to ask Traphan about the assignments, Adams allegedly went on a five-minute rant and began screaming in front of Traphan and other co-workers about how he was not "allowed" to talk about the drill roster, referencing LeClear's previous instructions.  (*Id*. at ¶ 123.)  Later that afternoon, Adams again screamed at Traphan because he could not find the key to a "portal monitor," which is not something for which she was responsible.  (*Id*. at ¶ 126.)  Believing that Adams' public criticisms and demeaning treatment had already damaged her reputation, Traphan sent LeClear an email raising the possibility of her resignation.  (*Id*. at ¶ 125.)

The following Monday, April 25, 2022, LeClear met with Traphan and asked her to stay.  When Unit Chief Paulson learned that Traphan raised the possibility of her resigning, he also met with Traphan on his own on April 25 to see if she would be interested in working in another unit, such as the X-Ray Unit, to which she had indicated an interest. (Paulson Decl. (dkt #44) ¶¶ 28-29.)  Later that day, however, Traphan formally resigned

13

by email, effective May 9, 2022. She did not mention allegations of discrimination in her email, but stated that she was disappointed over her inability to grow within DHS, as she had intended to become an "integral" part of the program.

Adams' offensive behavior continued after Traphan's resignation. On May 2, 2022, Adams screamed at Traphan again over a live stream video conference with more than three dozen people listening. (Traphan Decl. (dkt. #38) ¶ 131.) Later that day, Adams stuck Traphan with a $300 bar tab after a retirement sendoff for another colleague that she had agreed to coordinate with him. (*Id.*)

On May 9, 2022, LeClear completed Traphan's last performance evaluation, noting that "Nicole was able to bring a fresh set of eyes to our unit and was able to help us identify needed changes that we would not have seen without her. Her expertise in the radiation field and ability to be thorough will be missed by our unit."

OPINION

Plaintiff asserts claims against both DHS and Adams in his individual capacity under 42 U.S.C. § 1983, as well as against DHS under Title VII of the Civil Rights Act.[2] More specifically, plaintiff claims that both defendants discriminated against her in violation of the Fourteenth Amendment Equal Protection Clause because of her race and gender by: (1) "failing to promote" her to an SRC position; and (2) subjecting her to a

---

[2] Plaintiff represented herself when she filed this lawsuit and the operative complaint. (Dkt. #13.) Although she is now represented by counsel, and the court's focus at summary judgment is on the evidence of record, the court continues to construe her complaint under less stringent standards than formal pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

hostile work environment, which ultimately caused plaintiff's constructive discharge when she resigned. (Dkt. #13 at ¶¶ 33, 43.) Plaintiff also claims that defendants retaliated against her after she complained to LeClear about discrimination on March 18, 2022. (*Id*.) Plaintiff bases her Title VII claims against DHS on the same allegations of discrimination and retaliation. (*Id*. at ¶¶ 53, 63). Defendants have moved for summary judgment on all of plaintiff's claims. (Dkt. #25.)

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, however, the nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to [reach] a verdict in [her] favor." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (citation and internal quotation marks omitted).

Further, while the court views the record "in the light most favorable to the nonmovant and constru[es] all reasonable inferences from the evidence in [her] favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), a nonmovant is only entitled to favorable inferences that are supported by admissible evidence, not those based upon mere speculation or conjecture, *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th

Cir. 2017), or upon "[c]onclusory statements, not grounded in specific facts," *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016).

## I.    Discrimination Claims Under Section 1983 and Title VII

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   Similarly, the Fourteenth Amendment Equal Protection Clause protects against intentional discrimination based on a protected classification, and 42 U.S.C. § 1983 provides an avenue for relief for such claims.  *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019).  Thus, courts evaluate discrimination claims under § 1983 and Title VII using essentially the same standard.[3]  *Id.*

### A.    Failure to Promote

Plaintiff alleges that defendants discriminated against her by "failing to promote [her] to an SRC position" because of her African American race and gender.  (Dkt. #13, at ¶¶ 33, 43.)  As proof of this claim, plaintiff points to the fact that Luther Loehrke, a white male DHS employee, was given the SRC qualification journal shortly after the SRC training activity in August 2021, and became an SRC team member following Schmidt's

---

[3] As defendants correctly note, one difference in the legal standard is that Title VII claims may only be brought against an "employer," whereas § 1983 only authorizes individual capacity suits against "persons" who qualify as state actors.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that neither a state nor its officials acting in their official capacities are "persons" under § 1983).  To the extent that plaintiff purports to sue DHS under § 1983, therefore, those claims must be dismissed.

retirement in January 2022, while she was only given the qualification journal or invited to become an SRC team member in March 2022, despite the fact that both she and Loehrke participated in the same August 2021 SRC training activity.  (Dkt. #33, at 13-14.)  On this thin reed, plaintiff claims defendants delayed giving her the SRC qualification journal because of her race and gender.

The applicable standard at summary judgment is whether the evidence would permit a reasonable jury to conclude that race or gender discrimination caused an adverse employment action -- here, the failure to promote. *Barnes v. Bd. of Trustees of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).  Where disparate treatment is alleged, a plaintiff must prove that she was a victim of intentional discrimination. *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).  While a plaintiff is free to offer direct or circumstantial evidence of discrimination, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766.  Here, plaintiff appears to rely on the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), which is one way to prove a failure-to-promote claim.  *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 646 (7th Cir. 2023); *see also Cunningham v. Austin*, 125 F.4th 783, 788 (7th Cir. 2025) (applying the *McDonnell Douglas* burden-shifting framework in a failure-to-promote case).

Under *McDonnell Douglas*, a plaintiff must first produce evidence of a prima facie case for failure to promote.  411 U.S. at 802.  A prima facie case of discrimination in the failure-to-promote context requires the plaintiff to present evidence showing that: (1) she was a member of a protected class; (2) she applied for and was qualified for the open

position; (3) she was rejected; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position. *Marnocha v. St. Vincent Hosp. & Health Care Center, Inc*., 986 F.3d 711, 721 (7th Cir. 2021).  If a plaintiff establishes a prima facie case of discrimination, the burden shifts to an employer to proffer a nondiscriminatory reason for its employment decision. *McDaniel v. Progress Rail Locomotive, Inc*., 940 F.3d 360, 368 (7th Cir. 2019).  If the employer produces evidence of a nondiscriminatory reason for the failure to promote, the burden then shifts back to the employee to produce evidence that the proffered reason for the employment decision is pretext for discrimination. *Marnocha*, 986 F.3d at 721.  To establish pretext, the plaintiff must identify "weaknesses, implausibilities, inconsistencies, or contradictions" in the defendant's proffered reasons that a reasonable person would find unworthy of credence. *de Lima Silva*, 917 F.3d at 561.

Being an African American female, plaintiff meets the first element of a prima facie case as she belongs to two protected classifications.  There is also no dispute that:  plaintiff expressed an interest in being designated an SRC after Schmidt announced his retirement in August 2021; plaintiff participated in an SRC training activity with Luther Loehrke in August 2021; and Loehrke, a white male, both received the SRC qualification journal shortly after that training activity and was ultimately given the SRC designation, instead of plaintiff, after he received a consensus vote from the existing SRC team members (comprised of Adams, LeClear, and Paulson).

However, defendants argue that plaintiff cannot satisfy the second element required to make a prima facie case of discrimination because she was invited to become an SRC

team member in March 2022, but resigned shortly thereafter and did not complete the relevant qualification requirements during her employment with DHS. (Dkt. #29, at 13.) Plaintiff does not dispute that she was offered the opportunity to become an SRC team member in March of 2022, nor that she resigned before completing the required qualifications to be made a member. Instead, she claims that Loehrke was allowed to qualify and was promoted to SRC ahead of her, having assumed SRC duties by January 2022 to fill the vacancy left open by Schmidt's retirement.

To the extent that plaintiff claims she was wrongly denied a promotion or that Loehrke was promoted ahead of her for discriminatory reasons, defendants first argue that plaintiff cannot prevail because she has not established that qualifying as an SRC constitutes a promotion or that failing to designate her as an SRC was an adverse employment action. (Dkt. #29, at 14-16; Dkt. #41, at 3.) To establish that an adverse employment action occurred, a plaintiff must show "'some injury respecting her employment terms or conditions' that 'left her worse off, but need not have left her significantly so.'" *Johnson v. Nestlé USA*, No. 19-cv-07119, 2024 WL 4333188, at *5 (N.D. Ill. Sept. 27, 2024) (quoting *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024)). Plaintiff does not assert that an SRC designation is a formal title or position at DHS, nor that it affects the employee's base pay or bonus potential, except for receipt of approximately $250 to $300 for any month the SRC is on call. (Dkt. #29, at 15.) While the Seventh Circuit has held that not providing an employee with a particular job title or designation, by itself, is not a sufficiently adverse action for a discrimination claim, *Grayson v. City of Chicago*, 317 F.3d 745, 750 (7th Cir. 2003), plaintiff argues that earning an SRC

designation not only has a remunerative benefit that could be viewed as a "bonus," but offers career advantages within her field.

Assuming that serving as an SRC is a promotion, defendants alternatively deny discriminating against plaintiff, contending that a legitimate, non-discriminatory reason existed for Loehrke to receive the SRC designation several months before a similar offer was made to plaintiff in March 2022. (Dkt. #29, at 17-18.)  To begin, defendants present uncontested evidence that the SRC team members considered plaintiff, Loehrke, and others for the SRC designation in August 2021, shortly after an SRC team member vacancy became available due to Schmidt's impending retirement, but that Loehrke was viewed as a better candidate.   (Paulson Decl. (dkt. #44) ¶¶ 5, 7;  Adams Decl. (dkt. #45) ¶¶ 3, 5-6.)  There is also no dispute that Paulson and the other SRC team members wanted to fill the vacancy as soon as possible to avoid overburdening the existing SRCs with additional work.  (Paulson Decl. (dkt. #44) ¶ 7; Adams Decl. (dkt. #45) ¶ 4.)  At the time the vacancy was announced in August 2021, Loehrke had been employed by DHS since 2015, whereas plaintiff had only been with DHS for four months and was still on a probationary basis. (Paulson Decl. (dkt. #44) ¶ 12; Adams Decl. (dkt. #45) ¶ 6.)  Relatedly, because of her short tenure with DHS, the SRC team members had only had one opportunity to formally evaluate her ability to perform SRC-related responsibilities.  (Paulson (dkt. #44) ¶¶ 11-12.)  Because the SRC team believed that Loehrke was the best choice to designate as an on-call SRC as quickly as possible, he was given the SRC qualification journal so that he could be designated to fill the vacancy created by Schmidt's imminent retirement. (Paulson Decl. (dkt. #44) ¶¶ 10, 13; Adams Decl. (dkt. #45) ¶¶ 6-8.)

An employer's genuine belief that another candidate's skillset makes them better suited for the job is a legitimate, nondiscriminatory hiring rationale. *See Cunningham*, 125 F.4th at 789 (citing *Barnes v. Bd. of Tr. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (hiring manager's belief that another candidate was better suited for the job because of his "thoughtful approach to taking over the position" constituted a legitimate, nondiscriminatory hiring rationale); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) (employer's genuine belief that another candidate was better qualified was a legitimate nondiscriminatory hiring rationale)); *see also Marnocha*, 986 F.3d at 721 (that the individual ultimately promoted was a better candidate is a legitimate, nondiscriminatory reason for refusing to promote a plaintiff).    Under the *McDonnell Douglas* framework, therefore, the burden shifts back to plaintiff to show defendants' stated reason for promoting Loehrke ahead of her was pretextual.  *Barnes*, 946 F.3d at 389-90.

Importantly here, the pretext inquiry asks not whether an employment decision was inaccurate or unfair, but whether the employer honestly believed the proffered reason for its decision.  *Collins v. American Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (citing *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012)).  In other words, "[t]o show that a decision is pretextual, a plaintiff must show that the employer itself did not believe the explanation -- that it is a lie[.]" *Consolino v. Dart*, 120 F.4th 1324, 1327 (7th Cir. 2024); *see also Collins*, 715 F.3d at 1000 ("Pretext means a lie, specifically a phony reason for some action.").    Unfortunately for plaintiff, she has presented *no* evidence from which a reasonable trier of fact could find or infer that Loehrke was less qualified than she was when he was chosen for the SRC team, nor that defendants' stated reason for giving him

the SRC designation ahead of her was fabricated. To the contrary, the evidence all points to the opposite. Even if a jury could reasonably infer that Adams was acting out of some unspoken prejudice (as opposed to his general cantankerousness towards his co-workers generally and plaintiff in particular, which seems the far more likely explanation), two others voted for Loehrke with no such history of unfair treatment toward plaintiff, including Paulson and LeClear, who shared plaintiff's view that Adams was difficult to work with and promoted her for consideration for SRC designation within a few months. Because plaintiff has not shown that a reasonable jury could conclude that she was denied the SRC designation left open by Schmidt's retirement due to her race or gender or both, defendants are entitled to summary judgment on this claim.

### B. Hostile Work Environment

As for plaintiff's claim that she was forced to resign due to a hostile work environment created by Adams' discriminatory treatment (dkt. #13, at ¶¶ 33, 43), a hostile work environment is actionable under Title VII "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). To prove a hostile work environment claim based on either race or gender, an employee must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is

22

a basis for employer liability. *Scaife v. United States Dep't of Veterans Affairs*, 49 F.4th 1109, 1115-16 (7th Cir. 2022).

Again, particularly important here since Adams appears to have displayed animosity and engaged in juvenile behavior indiscriminately to his fellow co-workers, not all incidents of workplace harassment constitute actionable discrimination. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII is not a general civility code for the American workplace"); *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) ("Title VII protects against discrimination, not 'personal animosity or juvenile behavior.'") (citation omitted). Thus, simply yelling and swearing at an employee does not suffice to demonstrate a hostile work environment if a plaintiff cannot *connect* the remarks to race or gender. *See Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 560 (7th Cir. 2019) (calling employee "a stupid dumb motherf[]" and threatening to "kick [his] ass" did not establish hostile work environment claim) (alteration in original).

In determining whether a workplace is objectively hostile, courts consider the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *Lambert v. Peri Formworks Sys. Inc.*, 723 F.3d 863, 868 (7th Cir. 2013). Although a workplace need not be "hellish" to constitute a hostile work environment, *Jackson v. Cnty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007), a hostile work environment must be "so pervaded by discrimination that the terms and conditions of employment were altered." *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013).

A plaintiff who makes a hostile work environment claim under Title VII may also establish a viable claim under § 1983 as a parallel remedy. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 834-35 (7th Cir. 2015). However, relief is available under § 1983 for a plaintiff claiming a hostile work environment only when she can demonstrate that the defendant acted with discriminatory intent. *Huff v. Sheahan*, 493 F.3d 893, 902 (7th Cir. 2007); *see also Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1187 (7th Cir. 1986) ("[T]he ultimate inquiry [in a § 1983 hostile work environment equal protection claim] is whether the sexual harassment constitutes intentional discrimination. This focus differs from the inquiry under Title VII as to whether the sexual harassment altered the conditions of the victim's employment.").

Regardless, as outlined above, plaintiff presents a litany of unpleasant incidents involving aggressive, demeaning, and intimidating conduct by Adams. From the outset of her employment, Adams reportedly provided her with misinformation and, more egregiously, screamed or yelled at her in front of others on multiple occasions. In one such instance, plaintiff found Adams' irate screaming so humiliating that she did not attend a social event planned for that evening. (Traphan Decl. (dkt. #38) ¶¶ 54-57.) On other occasions, Adams refused to collaborate with plaintiff or provide meaningful feedback. Adams further limited plaintiff's role during the exercise at the Point Beach Power Plant and allegedly refused to train her properly. Adams also deliberately withheld information from plaintiff, causing a failed exercise at Holy Family Hospital. (*Id.* at ¶¶ 77, 79.) Adams later expressed concerns about plaintiff's abilities in connection with this incident to a

24

FEMA official while attending a national conference, which plaintiff felt was damaging to her reputation.   (*Id*. at ¶ 100.)

Still, considering the totality of the allegations set forth in plaintiff's declaration and, assuming that *all* of her allegations about Adams' conduct are true, plaintiff has not presented evidence that would sustain a hostile work environment claim.  To begin, Adams was not plaintiff's supervisor; rather, he was a co-worker.  The Seventh Circuit has repeatedly treated a supervisor's use of toxic language and behavior in the workplace as much more serious than a co-worker's.  *See Robinson v. Perales*, 894 F.3d 818, 828-29 (7th Cir. 2018) ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' . . . than the use of an unambiguously racial epithet such as 'n- - - -r' by a supervisor in the presence of his subordinates.") (citing *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)); *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (supervisor's use of the term "n- - - -r" impacts the work environment far more severely than use by co-equals).

More importantly, plaintiff has again submitted *no* evidence beyond her own perception that Adams targeted her or treated her unfairly because of her race or gender, which is insufficient to survive summary judgment.  *See Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (affidavits based on speculation are insufficient to defeat summary judgment in an employment discrimination case); *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005) ("not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a [protected group]"); *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d

25

340, 345-46 (7th Cir. 1999) (an employment discrimination plaintiff must provide evidence that he or she was subjected to conduct that had a racial or sexual "character or purpose").   While such a connection does not have to be explicit, there must be some connection, for "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a [protected classification]." *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014).   Although plaintiff may have been subject to unwelcome bullying and disrespectful treatment, she has been unable to provide sufficient evidence for a rational jury to conclude that she suffered actionable harassment or intentional discrimination based on her race or her gender or both.   While the court can certainly understand plaintiff's belief that Adams' treatment of her was based, at least in part on bias, the absence of any evidence to that effect, combined with the fact that plaintiff's supervisor did not share Adams' views about her abilities or future with DHS, is fatal to her hostile work environment claim under Title VII and § 1983.

## C. Constructive Discharge

Similarly, plaintiff's claim that she was constructively discharged in light of Adams' verbal abuse and mistreatment, causing her to resign for fear that his actions, which included derogatory comments to a FEMA official, would harm her reputation, falls short on the actual evidence of record.   (Traphan Decl. (dkt. #34), ¶¶ 124-28; Dkt. #13, at ¶¶ 33, 43.)   To demonstrate constructive discharge, a plaintiff must show that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable.   *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir.

2002).  Once again, the court agrees that plaintiff has demonstrated co-working with Adams was a disagreeable part of her employment.  However, when an employee resigns due to allegedly discriminatory harassment, "such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Wright v. Ill. Dep't of Children & Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015) (quoting *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010)).  Indeed, when a plaintiff's hostile work environment claim fails, their constructive discharge claim is also "doomed," as the latter is more difficult to establish than the former.  *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 650 (7th Cir. 2011) (citing *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401-02 (7th Cir. 2010)).

"Conditions amounting to constructive discharge must be pervasive and extreme." *Beverly v. Abbot Labs.*, 107 F.4th 737, 745 (7th Cir. 2024); *see also, e.g.*, *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 631-33, 641 (7th Cir. 2009) (employees taunted the plaintiff with nooses and threatened him with comments about his death because of his race, which conduct "clearly qualifies as egregious for purposes of constructive discharge").  Plaintiff has not presented sufficient evidence to support a hostile work environment claim for reasons discussed previously.  In particular, she has not presented evidence showing that there was *any* connection between the alleged harassment by co-worker Adams and her race or gender.  Thus, plaintiff has failed to present evidence from which a reasonable jury could form a constructive discharge as well.  *See Scaife*, 49 F.4th at 1119.

27

## II.     Retaliation

Finally, plaintiff claims that she was subjected to retaliation for her protected complaints about Adams' discriminatory conduct.  (Dkt. #13, at ¶¶ 33, 43, 53, 63.)  As an initial matter, DHS correctly notes that plaintiff cannot bring a retaliation claim against Adams under § 1983.  (Dkt. #29, at 29.)  As plaintiff acknowledges (dkt. #33, at 13), the Seventh Circuit has held that "the right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause."  *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004) (citations omitted).  That leaves plaintiff's Title VII retaliation claim against defendant DHS.

"Employers are prohibited from punishing employees for complaining about discrimination or other practices that violate Title VII."  *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003); 42 U.S.C. § 2000e-3(a).  To prove retaliation under Title VII, a plaintiff must show: (1) she engaged in statutorily protected activity; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected activity and the adverse action.  *Scaife*, 49 F.4th at 1118.  For a retaliation claim, an adverse employment action is that which would "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). In particular, the plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

The parties do not dispute that plaintiff engaged in a protected activity when she complained to LeClear in March 2022 about her belief that Adams' conduct towards her

28

constituted discrimination based on her race or gender. Instead, DHS contends that plaintiff's claim fails because she has not established a requisite adverse action. This court agrees. If anything, DHS took steps to *improve* plaintiff's work environment by addressing the concerns she raised about Adams in his performance evaluation, which took place shortly after plaintiff asserted to LeClear that Adams' conduct appeared discriminatory. By contrast, it is also undisputed that plaintiff received a "glowing final performance review," stating that she "was able to bring a fresh set of eyes to our unit and was able to help us identify needed changes that we would not have seen without her."

Regardless, plaintiff does not identify a specific adverse action taken by DHS following her complaint of discrimination in March of 2022. Instead, she appears to allege constructive discharge as an adverse action for her retaliation claim. (Dkt. #13, at ¶¶ 33, 43, 53, 63.) As the court has already discussed, however, she has not submitted sufficient proof that she was constructively discharged, so this cannot provide the basis for her retaliation claim. *See Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) ("The plaintiff must show that the employer took the adverse employment action *because* of the protected activity.")(emphasis added). Because plaintiff does not identify any other potentially adverse action taken by DHS directly as the result of her protected activity, no reasonable jury could conclude that DHS retaliated against her in violation of Title VII.

Thus, in the absence of a valid claim, defendants' motion for summary judgment will be granted.

ORDER

IT IS ORDERED that:

1. The motion for summary judgment filed by defendants Wisconsin Department of Health Services and Charles Adams (dkt. #25) is GRANTED.

2. The clerk of court is directed to enter judgment for the defendants and close this case.

Entered this 1st day of July, 2025.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

30